(Slip Opinion) OCTOBER TERM, 2008 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DISTRICT ATTORNEY'S OFFICE FOR THE THIRD JUDICIAL DISTRICT ET AL. *v.* OSBORNE

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 08–6.   Argued March 2, 2009—Decided June 18, 2009

Respondent Osborne was convicted of sexual assault and other crimes in state court.  Years later, he filed this suit under 42 U. S. C. §1983, claiming he had a due process right to access the evidence used against him in order to subject it to DNA testing at his own expense. The Federal District Court first dismissed his claim under *Heck* v. *Humphrey*, 512 U. S. 477, holding that Osborne must proceed in habeas because he sought to set the stage for an attack on his conviction.  The Ninth Circuit reversed, concluding that §1983 was the proper vehicle for Osborne's claims.  On remand, the District Court granted Osborne summary judgment, concluding that he had a limited constitutional right to the new testing under the unique and specific facts presented, *i.e.,* that such testing had been unavailable at trial, that it could be accomplished at almost no cost to the State, and that the results were likely to be material.  The Ninth Circuit affirmed, relying on the prosecutorial duty to disclose exculpatory evidence under, *e.g., Brady* v. *Maryland*, 373 U. S. 83.

*Held:* Assuming Osborne's claims can be pursued using §1983, he has no constitutional right to obtain postconviction access to the State's evidence for DNA testing.  Pp. 8–21.

   (a) DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty.  The availability of new DNA testing technologies, however, cannot mean that every criminal conviction, or even every criminal conviction involving biological evidence, is suddenly in doubt.  The task of establishing rules to harness DNA's power to prove innocence without unnecessarily overthrowing the established criminal justice system belongs primarily to the legislature.  See *Washington* v. *Glucksberg*, 521 U. S. 702, 719.  Forty-six

States and the Federal Government have already enacted statutes
dealing specifically with access to evidence for DNA testing.  These
laws recognize the value of DNA testing but also the need for condi-
tions on accessing the State's evidence.  Alaska is one of a handful of
States yet to enact specific DNA testing legislation, but Alaska courts
are addressing how to apply existing discovery and postconviction re-
lief laws to this novel technology.  Pp. 8–11.

  (b) The Court assumes without deciding that the Ninth Circuit was
correct that *Heck* does not bar Osborne's §1983 claim.  That claim can
be rejected without resolving the proper application of *Heck*.  Pp. 12–
13.

  (c) The Ninth Circuit erred in finding a due process violation.
Pp. 13–21.

    (i) While Osborne does have a liberty interest in pursuing the
postconviction relief granted by the State, the Ninth Circuit erred in
extending the *Brady* right of pretrial disclosure to the postconviction
context.  Osborne has already been found guilty and therefore has
only a limited liberty interest in postconviction relief.  See, *e.g.,
Herrera* v. *Collins*, 506 U. S. 390, 399.  Instead of the *Brady* inquiry,
the question is whether consideration of Osborne's claim within the
framework of the State's postconviction relief procedures "offends
some [fundamental] principle of justice" or "transgresses any recog-
nized principle of fundamental fairness in operation."  *Medina* v.
*California*, 505 U. S. 437, 446, 448.  Federal courts may upset a
State's postconviction relief procedures only if they are fundamen-
tally inadequate to vindicate the substantive rights provided.

  There is nothing inadequate about Alaska's postconviction relief
procedures in general or its methods for applying those procedures to
persons seeking access to evidence for DNA testing.  The State pro-
vides a substantive right to be released on a sufficiently compelling
showing of new evidence that establishes innocence.  It also provides
for discovery in postconviction proceedings, and has—through judi-
cial decision—specified that such discovery is available to those seek-
ing access to evidence for DNA testing.  These procedures are similar
to those provided by federal law and the laws of other States, and
they satisfy due process.  The same is true for Osborne's reliance on a
claimed federal right to be released upon proof of "actual innocence."
Even assuming such a right exists, which the Court has not decided
and does not decide, there is no due process problem, given the pro-
cedures available to access evidence for DNA testing.  Pp. 13–18.

    (ii) The Court rejects Osborne's invitation to recognize a free-
standing, substantive due process right to DNA evidence untethered
from the liberty interests he hopes to vindicate with it.  In the cir-
cumstances of this case, there is no such right.  Generally, the Court

Syllabus

is "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins* v. *Harker Heights*, 503 U. S. 115, 125. There is no long history of a right of access to state evidence for DNA testing that might prove innocence. "The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it." *Reno* v. *Flores*, 507 U. S. 292, 303. Moreover, to suddenly constitutionalize this area would short-circuit what has been a prompt and considered legislative response by Congress and the States. It would shift to the Federal Judiciary responsibility for devising rules governing DNA access and creating a new constitutional code of procedures to answer the myriad questions that would arise. There is no reason to suppose that federal courts' answers to those questions will be any better than those of state courts and legislatures, and good reason to suspect the opposite. See, *e.g., Collins, supra,* at 125. Pp. 19–21.

521 F. 3d 1118, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined. ALITO, J., filed a concurring opinion, in which KENNEDY, J., joined, and in which THOMAS, J., joined as to Part II. STEVENS, J., filed a dissenting opinion, in which GINSBURG and BREYER, JJ., joined, and in which SOUTER, J., joined as to Part I. SOUTER, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–6

DISTRICT ATTORNEY'S OFFICE FOR THE THIRD JUDICIAL DISTRICT, ET AL., PETITIONERS *v.* WILLIAM G. OSBORNE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 18, 2009]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty. It has the potential to significantly improve both the criminal justice system and police investigative practices. The Federal Government and the States have recognized this, and have developed special approaches to ensure that this evidentiary tool can be effectively incorporated into established criminal procedure—usually but not always through legislation.

Against this prompt and considered response, the respondent, William Osborne, proposes a different approach: the recognition of a freestanding and far-reaching constitutional right of access to this new type of evidence. The nature of what he seeks is confirmed by his decision to file this lawsuit in federal court under 42 U. S. C. §1983, not within the state criminal justice system. This approach would take the development of rules and procedures in this area out of the hands of legislatures and state courts

shaping policy in a focused manner and turn it over to federal courts applying the broad parameters of the Due Process Clause. There is no reason to constitutionalize the issue in this way. Because the decision below would do just that, we reverse.

## I

### A

This lawsuit arose out of a violent crime committed 16 years ago, which has resulted in a long string of litigation in the state and federal courts. On the evening of March 22, 1993, two men driving through Anchorage, Alaska, solicited sex from a female prostitute, K. G. She agreed to perform fellatio on both men for $100 and got in their car. The three spent some time looking for a place to stop and ended up in a deserted area near Earthquake Park. When K. G. demanded payment in advance, the two men pulled out a gun and forced her to perform fellatio on the driver while the passenger penetrated her vaginally, using a blue condom she had brought. The passenger then ordered K. G. out of the car and told her to lie face-down in the snow. Fearing for her life, she refused, and the two men choked her and beat her with the gun. When K. G. tried to flee, the passenger beat her with a wooden axe handle and shot her in the head while she lay on the ground. They kicked some snow on top of her and left her for dead. 521 F. 3d 1118, 1122 (CA9 2008) (case below); *Osborne* v. *State*, 163 P. 3d 973, 975–976 (Alaska App. 2007) (*Osborne II*); App. 27, 42–44.

K. G. did not die; the bullet had only grazed her head. Once the two men left, she found her way back to the road, and flagged down a passing car to take her home. Ultimately, she received medical care and spoke to the police. At the scene of the crime, the police recovered a spent shell casing, the axe handle, some of K. G.'s clothing stained with blood, and the blue condom. *Jackson* v.

*State*, No. A–5276 etc. (Alaska App., Feb. 7, 1996), App. to Pet. for Cert. 117a.

Six days later, two military police officers at Fort Richardson pulled over Dexter Jackson for flashing his headlights at another vehicle. In his car they discovered a gun (which matched the shell casing), as well as several items K. G. had been carrying the night of the attack. *Id.,* at 116a, 118a–119a. The car also matched the description K. G. had given to the police. Jackson admitted that he had been the driver during the rape and assault, and told the police that William Osborne had been his passenger. 521 F. 3d, at 1122–1123; 423 F. 3d 1050, 1051–1052 (CA9 2005); *Osborne* v. *State*, 110 P. 3d 986, 990 (Alaska App. 2005) (*Osborne I*). Other evidence also implicated Osborne. K. G. picked out his photograph (with some uncertainty) and at trial she identified Osborne as her attacker. Other witnesses testified that shortly before the crime, Osborne had called Jackson from an arcade, and then driven off with him. An axe handle similar to the one at the scene of the crime was found in Osborne's room on the military base where he lived.

The State also performed DQ Alpha testing on sperm found in the blue condom. DQ Alpha testing is a relatively inexact form of DNA testing that can clear some wrongly accused individuals, but generally cannot narrow the perpetrator down to less than 5% of the population. See Dept. of Justice, National Comm'n on the Future of DNA Evidence, The Future of Forensic DNA Testing 17 (NCJ 183697, 2000) (hereinafter Future of Forensic DNA Testing); Dept. of Justice, National Comm'n on the Future of DNA Evidence, Postconviction DNA Testing: Recommendations for Handling Requests 27 (NCJ 177626, 1999) (hereinafter Postconviction DNA Testing). The semen found on the condom had a genotype that matched a blood sample taken from Osborne, but not ones from Jackson, K. G., or a third suspect named James Hunter. Osborne is

black, and approximately 16% of black individuals have such a genotype. App. 117–119. In other words, the testing ruled out Jackson and Hunter as possible sources of the semen, and also ruled out over 80% of other black individuals. The State also examined some pubic hairs found at the scene of the crime, which were not susceptible to DQ Alpha testing, but which state witnesses attested to be similar to Osborne's. App. to Pet. for Cert. 117a.

B

Osborne and Jackson were convicted by an Alaska jury of kidnaping, assault, and sexual assault. They were acquitted of an additional count of sexual assault and of attempted murder. Finding it "'nearly miraculous'" that K. G. had survived, the trial judge sentenced Osborne to 26 years in prison, with 5 suspended. *Id.,* at 128a. His conviction and sentence were affirmed on appeal. *Id.,* at 113a–130a.

Osborne then sought postconviction relief in Alaska state court. He claimed that he had asked his attorney, Sidney Billingslea, to seek more discriminating restriction-fragment-length-polymorphism (RFLP) DNA testing during trial, and argued that she was constitutionally ineffective for not doing so.[1] Billingslea testified that after investigation, she had concluded that further testing would do more harm than good. She planned to mount a defense of mistaken identity, and thought that the imprecision of the DQ Alpha test gave her "'very good numbers in a mistaken identity, cross-racial identification case, where the victim was in the dark and had bad eyesight.'"

―――――――
[1] RFLP testing, unlike DQ Alpha testing, "has a high degree of discrimination," although it is sometimes ineffective on small samples. Postconviction DNA Testing 26–27; Future of Forensic DNA Testing 14–16. Billingslea testified that she had no memory of Osborne making such a request, but said she was "'willing to accept'" that he had. *Osborne I*, 110 P. 3d 986, 990 (Alaska App. 2005).

*Osborne I*, 110 P. 3d, at 990. Because she believed Osborne was guilty, "'insisting on a more advanced . . . DNA test would have served to prove that Osborne committed the alleged crimes.'" *Ibid*. The Alaska Court of Appeals concluded that Billingslea's decision had been strategic and rejected Osborne's claim. *Id.,* at 991–992.

In this proceeding, Osborne also sought the DNA testing that Billingslea had failed to perform, relying on an Alaska postconviction statute, Alaska Stat. §12.72 (2008), and the State and Federal Constitutions. In two decisions, the Alaska Court of Appeals concluded that Osborne had no right to the RFLP test. According to the court, §12.72 "apparently" did not apply to DNA testing that had been available at trial.[2] *Osborne I*, 110 P. 3d, at 992–993. The court found no basis in our precedents for recognizing a federal constitutional right to DNA evidence. *Id.,* at 993. After a remand for further findings, the Alaska Court of Appeals concluded that Osborne could not claim a state constitutional right either, because the other evidence of his guilt was too strong and RFLP testing was not likely to be conclusive. *Osborne II*, 163 P. 3d, at 979–981. Two of the three judges wrote separately to say that "[i]f Osborne could show that he were in fact innocent, it would be unconscionable to punish him," and that doing so might violate the Alaska Constitution. *Id.,* at 984–985 (Mannheimer, J., concurring).

The court relied heavily on the fact that Osborne had confessed to some of his crimes in a 2004 application for parole—in which it is a crime to lie. *Id.,* at 978–979, 981 (majority opinion) (citing Alaska Stat. §11.56.210 (2002)). In this statement, Osborne acknowledged forcing K. G. to

---

[2] It is not clear whether the Alaska Court of Appeals was correct that Osborne sought *only* forms of DNA testing that had been available at trial, compare *Osborne I, supra,* at 992, 995, with 521 F. 3d 1118, 1123, n. 2 (CA9 2008), but it resolved the case on that basis.

have sex at gunpoint, as well as beating her and covering her with snow. *Id.,* at 977–978, n. 11. He repeated this confession before the parole board. Despite this acceptance of responsibility, the board did not grant him discretionary parole. App. to Pet. for Cert. 8a. In 2007, he was released on mandatory parole, but he has since been rearrested for another offense, and the State has petitioned to revoke this parole. Brief for Petitioners 7, n. 3.

Meanwhile, Osborne had also been active in federal court, suing state officials under 42 U. S. C. §1983. He claimed that the Due Process Clause and other constitutional provisions gave him a constitutional right to access the DNA evidence for what is known as short-tandem-repeat (STR) testing (at his own expense). App. 24. This form of testing is more discriminating than the DQ Alpha or RFLP methods available at the time of Osborne's trial.[3] The District Court first dismissed the claim under *Heck* v. *Humphrey*, 512 U. S. 477 (1994), holding it "inescapable" that Osborne sought to "set the stage" for an attack on his conviction, and therefore "must proceed through a writ of habeas corpus." App. 207 (internal quotation marks omitted). The United States Court of Appeals for the Ninth Circuit reversed, concluding that §1983 was the proper vehicle for Osborne's claims, while "express[ing] no opinion as to whether Osborne ha[d] been deprived of a federally protected right." 423 F. 3d, at 1056.

On cross-motions for summary judgment after remand,

---

[3] STR testing is extremely discriminating, can be used on small samples, and is "rapidly becoming the standard." Future of Forensic DNA Testing 18, n. 9. Osborne also sought to subject the pubic hairs to mitochondrial DNA testing, a secondary testing method often used when a sample cannot be subjected to other tests. See Postconviction DNA Testing 28. He argues that "[a]ll of the same arguments that support access to the condom for STR testing support access to the hairs for mitochondrial testing as well," Brief for Respondent 11, n. 4, and we treat the claim accordingly.

the District Court concluded that "there *does* exist, *under the unique and specific facts presented*, a very limited constitutional right to the testing sought."  445 F. Supp. 2d 1079, 1081 (2006).  The court relied on several factors: that the testing Osborne sought had been unavailable at trial, that the testing could be accomplished at almost no cost to the State, and that the results were likely to be material.  *Id.,* at 1081–1082.  It therefore granted summary judgment in favor of Osborne.

The Court of Appeals affirmed, relying on the prosecutorial duty to disclose exculpatory evidence recognized in *Pennsylvania* v. *Ritchie*, 480 U. S. 39 (1987), and *Brady* v. *Maryland*, 373 U. S. 83 (1963).  While acknowledging that our precedents "involved only the right to *pre-trial* disclosure," the court concluded that the Due Process Clause also "extends the government's duty to disclose (or the defendant's right of access) to *post-conviction* proceedings." 521 F. 3d, at 1128.  Although Osborne's trial and appeals were over, the court noted that he had a "potentially viable" state constitutional claim of "actual innocence," *id.,* at 1130, and relied on the "well-established assumption" that a similar claim arose under the Federal Constitution, *id.,* at 1131; cf. *Herrera* v. *Collins*, 506 U. S. 390 (1993). The court held that these potential claims extended some of the State's *Brady* obligations to the postconviction context.

The court declined to decide the details of what showing must be made to access the evidence because it found "Osborne's case for disclosure . . . so strong on the facts" that "[w]herever the bar is, he crosses it."  521 F. 3d*,* at 1134.  While acknowledging that Osborne's prior confessions were "certainly relevant," the court concluded that they did not "necessarily trum[p] . . . the right to obtain post-conviction access to evidence" in light of the "emerging reality of wrongful convictions based on false confessions." *Id.,* at 1140.

We granted certiorari to decide whether Osborne's claims could be pursued using §1983, and whether he has a right under the Due Process Clause to obtain postconviction access to the State's evidence for DNA testing. 555 U. S. ___ (2008); Pet. for Cert. i. We now reverse on the latter ground.

II

Modern DNA testing can provide powerful new evidence unlike anything known before. Since its first use in criminal investigations in the mid-1980s, there have been several major advances in DNA technology, culminating in STR technology. It is now often possible to determine whether a biological tissue matches a suspect with near certainty. While of course many criminal trials proceed without any forensic and scientific testing at all, there is no technology comparable to DNA testing for matching tissues when such evidence is at issue. Postconviction DNA Testing 1–2; Future of Forensic DNA Testing 13–14. DNA testing has exonerated wrongly convicted people, and has confirmed the convictions of many others.

At the same time, DNA testing alone does not always resolve a case. Where there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent. See *House* v. *Bell*, 547 U. S. 518, 540–548 (2006). The availability of technologies not available at trial cannot mean that every criminal conviction, or even every criminal conviction involving biological evidence, is suddenly in doubt. The dilemma is how to harness DNA's power to prove innocence without unnecessarily overthrowing the established system of criminal justice.

That task belongs primarily to the legislature. "[T]he States are currently engaged in serious, thoughtful examinations," *Washington* v. *Glucksberg*, 521 U. S. 702, 719 (1997), of how to ensure the fair and effective use of this

testing within the existing criminal justice framework. Forty-six States have already enacted statutes dealing specifically with access to DNA evidence. See generally Brief for State of California et al. as *Amici Curiae* 3–13; Garrett, Claiming Innocence, 92 Minn. L. Rev 1629, 1719 (2008) (surveying state statutes); see also An Act to Improve the Preservation and Accessibility of Biological Evidence, Mississippi S. 2709 (enacted March 16, 2009); An Act to Provide for DNA Testing for Certain Inmates for the Purposes of Determining Whether They May Have Been Wrongfully Convicted, South Dakota H. 1166 (enacted March 11, 2009). The State of Alaska itself is considering joining them. See An Act Relating to Post-conviction DNA Testing, H. 174, 26th Leg., 1st Sess. (2009) (proposed legislation similar to that enacted by the States). The Federal Government has also passed the Innocence Protection Act of 2004, §411, 118 Stat. 2278, codified in part at 18 U. S. C. §3600, which allows federal prisoners to move for court-ordered DNA testing under certain specified conditions. That Act also grants money to States that enact comparable statutes, §413, 118 Stat. 2285, note following 42 U. S. C. §14136, and as a consequence has served as a model for some state legislation. At oral argument, Osborne agreed that the federal statute is a model for how States ought to handle the issue. Tr. of Oral Arg. 33, 38–39; see also Brief for United States as *Amicus Curiae* 19–26 (defending constitutionality of Innocence Protection Act).

These laws recognize the value of DNA evidence but also the need for certain conditions on access to the State's evidence. A requirement of demonstrating materiality is common, *e.g.*, 18 U. S. C. §3600(a)(8), but it is not the only one. The federal statute, for example, requires a sworn statement that the applicant is innocent. §3600(a)(1). This requirement is replicated in several state statutes. *E.g.*, Cal. Penal Code Ann. §§1405(b)(1), (c)(1) (West Supp.

2009); Fla. Stat. §925.11(2)(a)(3) (2006); N. H. Rev. Stat. Ann. 651–D:2(I)(b) (2007); S. C. Code Ann. 17–28–40 (Supp. 2008). States also impose a range of diligence requirements. Several require the requested testing to "have been technologically impossible at trial." Garrett, *supra*, at 1681, and n. 242. Others deny testing to those who declined testing at trial for tactical reasons. *E.g.*, Utah Code. Ann. §78B–9–301(4) (2008).

Alaska is one of a handful of States yet to enact legislation specifically addressing the issue of evidence requested for DNA testing. But that does not mean that such evidence is unavailable for those seeking to prove their innocence. Instead, Alaska courts are addressing how to apply existing laws for discovery and postconviction relief to this novel technology. See *Osborne I*, 110 P. 3d, at 992–993; *Patterson* v. *State*, No. A–8814, 2006 WL 573797, *4 (Alaska App., Mar. 8, 2006). The same is true with respect to other States that do not have DNA-specific statutes. *E.g.*, *Fagan* v. *State*, 957 So. 2d 1159 (Ala. Crim. App. 2007). Cf. Mass. Rule Crim. Proc. 30(c)(4) (2009).

First, access to evidence is available under Alaska law for those who seek to subject it to newly available DNA testing that will prove them to be actually innocent. Under the State's general postconviction relief statute, a prisoner may challenge his conviction when "there exists evidence of material facts, not previously presented and heard by the court, that requires vacation of the conviction or sentence in the interest of justice." Alaska Stat. §12.72.010(4) (2008). Such a claim is exempt from otherwise applicable time limits if "newly discovered evidence," pursued with due diligence, "establishes by clear and convincing evidence that the applicant is innocent." §12.72.020(b)(2).

Both parties agree that under these provisions of §12.72, "a defendant is entitled to post-conviction relief if the defendant presents newly discovered evidence that estab-

lishes by clear and convincing evidence that the defendant is innocent." *Osborne I, supra*, at 992 (internal quotation marks omitted). If such a claim is brought, state law permits general discovery. See Alaska Rule Crim. Proc. 35.1(g). Alaska courts have explained that these procedures are available to request DNA evidence for newly available testing to establish actual innocence. See *Patterson, supra*, at *4 ("If Patterson had brought the DNA analysis request as part of his previous application for [postconviction] relief . . . he would have been able to request production of evidence").

In addition to this statutory procedure, the Alaska Court of Appeals has invoked a widely accepted three-part test to govern additional rights to DNA access under the State Constitution. *Osborne II*, 163 P. 3d, at 974–975. Drawing on the experience with DNA evidence of State Supreme Courts around the country, the Court of Appeals explained that it was "reluctant to hold that Alaska law offers no remedy to defendants who could prove their factual innocence." *Osborne I*, 110 P. 3d, at 995; see *id.*, at 995, n. 27 (citing decisions from other state courts). It was "prepared to hold, however, that a defendant who seeks post-conviction DNA testing . . . must show (1) that the conviction rested primarily on eyewitness identification evidence, (2) that there was a demonstrable doubt concerning the defendant's identification as the perpetrator, and (3) that scientific testing would likely be conclusive on this issue." *Id.,* at 995. Thus, the Alaska courts have suggested that even those who do not get discovery under the State's criminal rules have available to them a safety valve under the State Constitution.

This is the background against which the Federal Court of Appeals ordered the State to turn over the DNA evidence in its possession, and it is our starting point in analyzing Osborne's constitutional claims.

### III

The parties dispute whether Osborne has invoked the proper federal statute in bringing his claim. He sued under the federal civil rights statute, 42 U. S. C. §1983, which gives a cause of action to those who challenge a State's "deprivation of any rights . . . secured by the Constitution." The State insists that Osborne's claim must be brought under 28 U. S. C. §2254, which allows a prisoner to seek "a writ of habeas corpus . . . on the ground that he is in custody in violation of the Constitution."

While Osborne's claim falls within the literal terms of §1983, we have also recognized that §1983 must be read in harmony with the habeas statute. See *Preiser* v. *Rodriguez*, 411 U. S. 475, 500 (1973); *Heck*, 512 U. S., at 487. "Stripped to its essence," the State says, "Osborne's §1983 action is nothing more than a request for evidence to support a hypothetical claim that he is actually innocent. . . . [T]his hypothetical claim sounds at the core of habeas corpus." Brief for Petitioners 19.

Osborne responds that his claim does not sound in habeas at all. Although invalidating his conviction is of course his ultimate goal, giving him the evidence he seeks "would not necessarily imply the invalidity of [his] confinement." Brief for Respondent 21. If he prevails, he would receive only *access* to the DNA, and even if DNA testing exonerates him, his conviction is not automatically invalidated. He must bring an entirely separate suit or a petition for clemency to invalidate his conviction. If he were proved innocent, the State might also release him on its own initiative, avoiding any need to pursue habeas at all.

Osborne also invokes our recent decision in *Wilkinson* v. *Dotson*, 544 U. S. 74 (2005). There, we held that prisoners who sought new hearings for parole eligibility and suitability need not proceed in habeas. We acknowledged that the two plaintiffs "hope[d]" their suits would "help bring

Cite as: 557 U. S. ____ (2009)

about earlier release," *id.,* at 78, but concluded that the
§1983 suit would not accomplish that without further
proceedings. "Because neither prisoner's claim would
necessarily spell speedier release, neither l[ay] at the core
of habeas corpus." *Id.,* at 82 (internal quotation marks
omitted). Every Court of Appeals to consider the question
since *Dotson* has decided that because access to DNA
evidence similarly does not "necessarily spell speedier
release," *ibid.,* it can be sought under §1983. See 423
F. 3d, at 1055–1056; *Savory* v. *Lyons*, 469 F. 3d 667, 672
(CA7 2006); *McKithen* v. *Brown*, 481 F. 3d 89, 103, and n.
15 (CA2 2007). On the other hand, the State argues that
*Dotson* is distinguishable because the challenged proce-
dures in that case did not affect the ultimate "exercise of
discretion by the parole board." Brief for Petitioners 32.
It also maintains that *Dotson* does not set forth "the *exclu-
sive* test for whether a prisoner may proceed under §1983."
Brief for Petitioners 32.

While we granted certiorari on this question, our resolu-
tion of Osborne's claims does not require us to resolve this
difficult issue. Accordingly, we will assume without decid-
ing that the Court of Appeals was correct that *Heck* does
not bar Osborne's §1983 claim. Even under this assump-
tion, it was wrong to find a due process violation.

## IV

### A

"No State shall . . . deprive any person of life, liberty, or
property, without due process of law." U. S. Const., Amdt.
14, §1; accord Amdt. 5. This Clause imposes procedural
limitations on a State's power to take away protected
entitlements. See, *e.g.*, *Jones* v. *Flowers*, 547 U. S. 220,
226–239 (2006). Osborne argues that access to the State's
evidence is a "process" needed to vindicate his right to
prove himself innocent and get out of jail. Process is not
an end in itself, so a necessary premise of this argument is

that he has an entitlement (what our precedents call a
"liberty interest") to prove his innocence even after a fair
trial has proved otherwise. We must first examine this
asserted liberty interest to determine what process (if any)
is due. See *Board of Regents of State Colleges* v. *Roth*, 408
U. S. 564, 570–571 (1972); *Olim* v. *Wakinekona*, 461 U. S.
238, 250–251 (1983).

In identifying his potential liberty interest, Osborne
first attempts to rely on the Governor's constitutional
authority to "grant pardons, commutations, and re-
prieves." Alaska Const., Art. III, §21. That claim can be
readily disposed of. We have held that noncapital defen-
dants do not have a liberty interest in traditional state
executive clemency, to which no particular claimant is
*entitled* as a matter of state law. *Connecticut Bd. of Par-
dons* v. *Dumschat*, 452 U. S. 458, 464 (1981). Osborne
therefore cannot challenge the constitutionality of any
procedures available to vindicate an interest in state
clemency.

Osborne does, however, have a liberty interest in dem-
onstrating his innocence with new evidence under state
law. As explained, Alaska law provides that those who
use "newly discovered evidence" to "establis[h] by clear
and convincing evidence that [they are] innocent" may
obtain "vacation of [their] conviction or sentence in the
interest of justice." Alaska Stat. §§12.72.020(b)(2),
12.72.010(4). This "state-created right can, in some cir-
cumstances, beget yet other rights to procedures essential
to the realization of the parent right." *Dumschat*, *supra*,
at 463; see also *Wolff* v. *McDonnell*, 418 U. S. 539, 556–
558 (1974).

The Court of Appeals went too far, however, in conclud-
ing that the Due Process Clause requires that certain
familiar preconviction trial rights be extended to protect
Osborne's postconviction liberty interest. After identifying
Osborne's possible liberty interests, the court concluded

that the State had an obligation to comply with the principles of *Brady* v. *Maryland*, 373 U. S. 83. In that case, we held that due process requires a prosecutor to disclose material exculpatory evidence to the defendant before trial. The Court of Appeals acknowledged that nothing in our precedents suggested that this disclosure obligation continued after the defendant was convicted and the case was closed, 521 F. 3d, at 1128, but it relied on prior Ninth Circuit precedent applying "*Brady* as a post-conviction right," *id.,* at 1128–1129 (citing *Thomas* v. *Goldsmith*, 979 F. 2d 746, 749–750 (1992)). Osborne does not claim that *Brady* controls this case, Brief for Respondent 39–40, and with good reason.

A criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man. At trial, the defendant is presumed innocent and may demand that the government prove its case beyond reasonable doubt. But "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." *Herrera* v. *Collins*, 506 U. S. 390, 399 (1993). "Given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty." *Dumschat*, *supra*, at 464 (internal quotation marks and alterations omitted).

The State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief. "[W]hen a State chooses to offer help to those seeking relief from convictions," due process does not "dictat[e] the exact form such assistance must assume." *Pennsylvania* v. *Finley*, 481 U. S. 551, 559 (1987). Osborne's right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief. *Brady* is the wrong framework.

Instead, the question is whether consideration of Os-

borne's claim within the framework of the State's proce-
dures for postconviction relief "offends some principle of
justice so rooted in the traditions and conscience of our
people as to be ranked as fundamental," or "transgresses
any recognized principle of fundamental fairness in opera-
tion." *Medina* v. *California*, 505 U. S. 437, 446, 448 (1992)
(internal quotation marks omitted); see *Herrera*, *supra*, at
407–408 (applying *Medina* to postconviction relief for
actual innocence); *Finley*, *supra*, at 556 (postconviction
relief procedures are constitutional if they "compor[t] with
fundamental fairness").    Federal courts may upset a
State's postconviction relief procedures only if they are
fundamentally inadequate to vindicate the substantive
rights provided.

We see nothing inadequate about the procedures Alaska
has provided to vindicate its state right to postconviction
relief in general, and nothing inadequate about how those
procedures apply to those who seek access to DNA evi-
dence.  Alaska provides a substantive right to be released
on a sufficiently compelling showing of new evidence that
establishes innocence.  It exempts such claims from oth-
erwise applicable time limits.    The State provides for
discovery in postconviction proceedings, and has—through
judicial decision—specified that this discovery procedure
is available to those seeking access to DNA evidence.
*Patterson*, 2006 WL 573797, at *4.  These procedures are
not without limits.  The evidence must indeed be newly
available to qualify under Alaska's statute, must have
been diligently pursued, and must also be sufficiently
material.  These procedures are similar to those provided
for DNA evidence by federal law and the law of other
States, see, *e.g.*, 18 U. S. C. §3600(a), and they are not
inconsistent with the "traditions and conscience of our
people" or with "any recognized principle of fundamental
fairness." *Medina*, *supra*, at 446, 448 (internal quotation
marks omitted).

And there is more. While the Alaska courts have not had occasion to conclusively decide the question, the Alaska Court of Appeals has suggested that the State Constitution provides an additional right of access to DNA. In expressing its "reluctan[ce] to hold that Alaska law offers no remedy" to those who belatedly seek DNA testing, and in invoking the three-part test used by other state courts, the court indicated that in an appropriate case the State Constitution may provide a failsafe even for those who cannot satisfy the statutory requirements under general postconviction procedures. *Osborne I*, 110 P. 3d, at 995–996.

To the degree there is some uncertainty in the details of Alaska's newly developing procedures for obtaining post-conviction access to DNA, we can hardly fault the State for that. Osborne has brought this §1983 action without ever using these procedures in filing a state or federal habeas claim relying on actual innocence. In other words, he has not tried to use the process provided to him by the State or attempted to vindicate the liberty interest that is now the centerpiece of his claim. When Osborne *did* request DNA testing in state court, he sought RFLP testing that had been available at trial, not the STR testing he now seeks, and the state court relied on that fact in denying him testing under Alaska law. *Osborne I*, *supra*, at 992 ("[T]he DNA testing that Osborne proposes to perform on this evidence existed at the time of Osborne's trial"); *Osborne II*, 163 P. 3d, at 984 (Mannheimer, J., concurring) ("[T]he DNA testing [Osborne] proposes would not yield 'new evidence' for purposes of . . . [Alaska Stat. §12.72.010]" because it was "available at the time of Osborne's trial").

His attempt to sidestep state process through a new federal lawsuit puts Osborne in a very awkward position. If he simply seeks the DNA through the State's discovery procedures, he might well get it. If he does not, it may be for a perfectly adequate reason, just as the federal statute

and all state statutes impose conditions and limits on access to DNA evidence. It is difficult to criticize the State's procedures when Osborne has not invoked them. This is not to say that Osborne must exhaust state-law remedies. See *Patsy* v. *Board of Regents of Fla.*, 457 U. S. 496, 500–501 (1982). But it is Osborne's burden to demonstrate the inadequacy of the state-law procedures available to him in state postconviction relief. Cf. *Medina, supra*, at 453. These procedures are adequate on their face, and without trying them, Osborne can hardly complain that they do not work in practice.

As a fallback, Osborne also obliquely relies on an asserted federal constitutional right to be released upon proof of "actual innocence." Whether such a federal right exists is an open question. We have struggled with it over the years, in some cases assuming, *arguendo*, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet. *House*, 547 U. S., at 554–555; *Herrera*, 506 U. S., at 398–417; see also *id.,* at 419–421 (O'Connor, J., concurring); *id.,* at 427–428 (SCALIA, J., concurring); Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 159, n. 87 (1970). In this case too we can assume without deciding that such a claim exists, because even if so there is no due process problem. Osborne does not dispute that a federal actual innocence claim (as opposed to a DNA access claim) would be brought in habeas. Brief for Respondent 22–24. If such a habeas claim is viable, federal procedural rules permit discovery "for good cause." 28 U. S. C. §2254 Rule 6; *Bracy* v. *Gramley*, 520 U. S. 899, 908–909 (1997). Just as with state law, Osborne cannot show that available discovery is facially inadequate, and cannot show that it would be arbitrarily denied to him.

### B

The Court of Appeals below relied only on procedural due process, but Osborne seeks to defend the judgment on the basis of substantive due process as well. He asks that we recognize a freestanding right to DNA evidence untethered from the liberty interests he hopes to vindicate with it. We reject the invitation and conclude, in the circumstances of this case, that there is no such substantive due process right. "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins* v. *Harker Heights*, 503 U. S. 115, 125 (1992). Osborne seeks access to state evidence so that he can apply new DNA-testing technology that might prove him innocent. There is no long history of such a right, and "[t]he mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it." *Reno* v. *Flores*, 507 U. S. 292, 303 (1993).

And there are further reasons to doubt. The elected governments of the States are actively confronting the challenges DNA technology poses to our criminal justice systems and our traditional notions of finality, as well as the opportunities it affords. To suddenly constitutionalize this area would short-circuit what looks to be a prompt and considered legislative response. The first DNA testing statutes were passed in 1994 and 1997. Act of Aug. 2, 1994, ch. 737, 1994 N. Y. Laws 3709 (codified at N. Y. Crim. Proc. Law Ann. §440.30(1–a) (West)); Act of May 9, 1997, Pub. Act No. 90–141, 1997 Ill. Laws 2461 (codified at 725 Ill. Comp. Stat., ch. 725, §5/116–3(a) (West)). In the past decade, 44 States and the Federal Government have followed suit, reflecting the increased availability of DNA testing. As noted, Alaska itself is considering such legislation. See *supra*, at 9. "By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate

and legislative action.  We must therefore exercise the utmost care whenever we are asked to break new ground in this field." *Glucksberg*, 521 U. S., at 720 (internal quotation marks omitted).  "[J]udicial imposition of a categorical remedy . . . might pretermit other responsible solutions being considered in Congress and state legislatures." *Murray* v. *Giarratano*, 492 U. S. 1, 14 (1989) (KENNEDY, J., concurring in judgment).  If we extended substantive due process to this area, we would cast these statutes into constitutional doubt and be forced to take over the issue of DNA access ourselves.  We are reluctant to enlist the Federal Judiciary in creating a new constitutional code of rules for handling DNA.[4]

Establishing a freestanding right to access DNA evidence for testing would force us to act as policymakers, and our substantive-due-process rulemaking authority would not only have to cover the right of access but a myriad of other issues.  We would soon have to decide if there is a constitutional obligation to preserve forensic evidence that might later be tested.  Cf. *Arizona* v. *Youngblood*, 488 U. S. 51, 56–58 (1988).  If so, for how long? Would it be different for different types of evidence? Would the State also have some obligation to gather such evidence in the first place?  How much, and when?  No doubt there would be a miscellany of other minor directives.  See, *e.g.*, *Harvey* v. *Horan*, 285 F. 3d 298, 300–301 (CA4 2002) (Wilkinson, C. J., concurring in denial of rehearing).

---

[4] The dissent asserts that our position "resembles" Justice Harlan's dissent in *Miranda* v. *Arizona*, 384 U. S. 436 (1966).  *Post*, at 15–16, n. 10 (opinion of STEVENS, J.).  *Miranda* devised rules to safeguard a constitutional right the Court had already recognized.  Indeed, the underlying requirement at issue in that case that confessions be voluntary had "roots" going back centuries. *Dickerson* v. *United States*, 530 U. S. 428, 432–433 (2000).  In contrast, the asserted right to access DNA evidence is unrooted in history or tradition, and would thrust the Federal Judiciary into an area previously left to state courts and legislatures.

In this case, the evidence has already been gathered and preserved, but if we extend substantive due process to this area, these questions would be before us in short order, and it is hard to imagine what tools federal courts would use to answer them. At the end of the day, there is no reason to suppose that their answers to these questions would be any better than those of state courts and legislatures, and good reason to suspect the opposite. See *Collins*, *supra*, at 125; *Glucksberg*, *supra*, at 720.

\*    \*    \*

DNA evidence will undoubtedly lead to changes in the criminal justice system. It has done so already. The question is whether further change will primarily be made by legislative revision and judicial interpretation of the existing system, or whether the Federal Judiciary must leap ahead—revising (or even discarding) the system by creating a new constitutional right and taking over responsibility for refining it.

Federal courts should not presume that state criminal procedures will be inadequate to deal with technological change. The criminal justice system has historically accommodated new types of evidence, and is a time-tested means of carrying out society's interest in convicting the guilty while respecting individual rights. That system, like any human endeavor, cannot be perfect. DNA evidence shows that it has not been. But there is no basis for Osborne's approach of assuming that because DNA has shown that these procedures are not flawless, DNA evidence must be treated as categorically outside the process, rather than within it. That is precisely what his §1983 suit seeks to do, and that is the contention we reject.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 08–6

DISTRICT ATTORNEY'S OFFICE FOR THE THIRD JUDICIAL DISTRICT, ET AL., PETITIONERS *v.* WILLIAM G. OSBORNE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 18, 2009]

JUSTICE ALITO, with whom JUSTICE KENNEDY joins, and with whom JUSTICE THOMAS joins as to Part II, concurring.

Respondent was convicted for a brutal sexual assault. At trial, the defense declined to have DNA testing done on a semen sample found at the scene of the crime. Defense counsel explained that this decision was made based on fear that the testing would provide further evidence of respondent's guilt. After conviction, in an unsuccessful attempt to obtain parole, respondent confessed in detail to the crime. Now, respondent claims that he has a federal constitutional right to test the sample and that he can go directly to federal court to obtain this relief without giving the Alaska courts a full opportunity to consider his claim.

I agree with the Court's resolution of respondent's constitutional claim. In my view, that claim also fails for two independent reasons beyond those given by the majority. First, a state prisoner asserting a federal constitutional right to perform such testing must file a petition for a writ of habeas corpus, not an action under 42 U. S. C. §1983, as respondent did here, and thus must exhaust state remedies, see 28 U. S. C. §2254(b)(1)(A). Second, even though respondent did not exhaust his state remedies, his claim may be rejected on the merits, see §2254(b)(2), because a

defendant who declines the opportunity to perform DNA testing at trial for tactical reasons has no constitutional right to perform such testing after conviction.

I

As our prior opinions illustrate, it is sometimes difficult to draw the line between claims that are properly brought in habeas and those that may be brought under 42 U. S. C. §1983.  See *Preiser* v. *Rodriguez*, 411 U. S. 475 (1973); *Heck* v. *Humphrey*, 512 U. S. 477 (1994); *Wilkinson* v. *Dotson*, 544 U. S. 74 (2005).  But I think that this case falls on the habeas side of the line.

We have long recognized the principles of federalism and comity at stake when state prisoners attempt to use the federal courts to attack their final convictions.  See, *e.g.*, *Darr* v. *Burford*, 339 U. S. 200, 204 (1950); *Braden* v. *30th Judicial Circuit Court of Ky.*, 410 U. S. 484, 490–491 (1973); *Preiser*, *supra*, at 491–492; *Rose* v. *Lundy*, 455 U. S. 509, 518–519 (1982); *Rhines* v. *Weber*, 544 U. S. 269, 273–274 (2005).  We accordingly held that "'it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation.'"  *Lundy*, *supra*, at 518 (quoting *Darr*, *supra*, at 204).  Congress subsequently codified *Lundy*'s exhaustion requirement in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U. S. C. §2254(b)(1)(A).

We also have long recognized the need to impose sharp limits on state prisoners' efforts to bypass state courts with their discovery requests.  See, *e.g.*, *Wainwright* v. *Sykes*, 433 U. S. 72, 87–90 (1977); *Keeney* v. *Tamayo-Reyes*, 504 U. S. 1, 8–10 (1992); *Williams* v. *Taylor*, 529 U. S. 420, 436 (2000).  For example, we have held that "concerns of finality, comity, judicial economy, and chan-neling the resolution of claims into the most appropriate forum" require a state prisoner to show "cause-and-

prejudice" before asking a federal habeas court to hold an evidentiary hearing. *Keeney*, *supra*, at 8. That result reduces opportunities for "'sandbagging' on the part of defense lawyers," *Sykes*, *supra*, at 89, and it "reduces the 'inevitable friction' that results when a federal habeas court 'overturns either the factual or legal conclusions reached by the state-court system,'" *Keeney*, *supra*, at 9 (quoting *Sumner* v. *Mata*, 449 U. S. 539, 550 (1981); brackets omitted). Congress subsequently codified *Keeney*'s cause-and-prejudice rule in AEDPA, 28 U. S. C. §2254(e)(2).

The rules set forth in our cases and codified in AEDPA would mean very little if state prisoners could simply evade them through artful pleading. For example, I take it as common ground that a state prisoner's claim under *Brady* v. *Maryland*, 373 U. S. 83 (1963), must be brought in habeas because that claim, if proved, would invalidate the judgment of conviction or sentence (and thus the lawfulness of the inmate's confinement). See *Heck*, *supra*, at 481. But under respondent's view, I see no reason why a *Brady* claimant could not bypass the state courts and file a §1983 claim in federal court, contending that he has a due process right to search the State's files for exculpatory evidence. Allowing such a maneuver would violate the principles embodied in *Lundy*, *Keeney*, and AEDPA.

Although respondent has now recharacterized his claim in an effort to escape the requirement of proceeding in habeas, in his complaint he squarely alleged that the State "deprived [him] of access to exculpatory evidence in violation of *Brady*[, *supra*], and the Due Process Clause of the Fourteenth Amendment to the U. S. Constitution." App. 37. That allegedly "exculpatory" evidence—which *Brady* defines as "evidence favorable to [the] accused" and "material either to guilt or to punishment," 373 U. S., at 87—would, by definition, undermine respondent's "guilt" or "punishment" if his allegations are true. Such claims

should be brought in habeas, see *Heck, supra*, at 481, and respondent cannot avoid that result by attempting to bring his claim under §1983, see *Dotson, supra*, at 92 (KENNEDY, J., dissenting).[1]

It is no answer to say, as respondent does, that he simply wants to use §1983 as a discovery tool to lay the foundation for a future state postconviction application, a state clemency petition, or a request for relief by means of "prosecutorial consent." See Brief for Respondent 23. Such tactics implicate precisely the same federalism and comity concerns that motivated our decisions (and Congress') to impose exhaustion requirements and discovery limits in federal habeas proceedings. If a petitioner can evade the habeas statute's exhaustion requirements in this way, I see no reason why a state prisoner asserting an ordinary *Brady* claim—*i.e.*, a state prisoner who claims that the prosecution failed to turn over exculpatory evidence prior to trial—could not follow the same course.

What respondent seeks was accurately described in his complaint—the discovery of evidence that has a material bearing on his conviction. Such a claim falls within "the core" of habeas. *Preiser, supra*, at 489. Recognition of a constitutional right to postconviction scientific testing of evidence in the possession of the prosecution would represent an expansion of *Brady* and a broadening of the discovery rights now available to habeas petitioners. See 28

———————

[1] This case is quite different from *Dotson*. In that case, two state prisoners filed §1983 actions challenging the constitutionality of Ohio's parole procedures and seeking "a new parole hearing that may or may not result in release, prescription of the composition of the hearing panel, and specification of the procedures to be followed." 544 U. S., at 86 (SCALIA, J., concurring). Regardless of whether such remedies fall outside the authority of federal habeas judges, compare *id.*, at 86–87, with *id.*, at 88–92 (KENNEDY, J., dissenting), there is no question that the relief respondent seeks in this case—"exculpatory" evidence that tends to prove his innocence—lies "within the core of habeas corpus," *Preiser* v. *Rodriguez,* 411 U. S. 475, 487 (1973).

U. S. C. §2254 Rule 6. We have never previously held that a state prisoner may seek discovery by means of a §1983 action, and we should not take that step here. I would hold that respondent's claim (like all other *Brady* claims) should be brought in habeas.

## II

The principles of federalism, comity, and finality are not the only ones at stake for the State in cases like this one. To the contrary, DNA evidence creates special opportunities, risks, and burdens that implicate important state interests. Given those interests—and especially in light of the rapidly evolving nature of DNA testing technology— this is an area that should be (and is being) explored "through the workings of normal democratic processes in the laboratories of the States." *Atkins, supra,* at 326 (Rehnquist, C. J., dissenting).[2]

———————

[2] Forty-six States, plus the District of Columbia and the Federal Government, have recently enacted DNA testing statutes. See 18 U. S. C. §3600; Ariz. Rev. Stat. Ann. §13–4240 (West 2001); Ark. Code Ann. §16–112–202 (2006); Cal. Penal Code Ann. §1405 (West Supp. 2009); Colo. Rev. Stat. Ann. §18–1–413 (2008); Conn. Gen. Stat. §52–582 (2009); Del. Code Ann., Tit. 11, §4504 (2007); D. C. Code §§22–4133 to §§22–4135 (2008 Supp.); Fla. Stat. §925.11 (2007); Ga. Code Ann. §5–5–41 (Supp. 2008); Haw. Rev. Stat. §844D–123 (2008 Cum. Supp.); Idaho Code §19–4902 (Lexis 2004); Ill. Comp. Stat., ch., 725, §5/116–3 (West 2006); Ind. Code Ann. §35–38–7–5 (West 2004); Iowa Code §81.10 (2009); Kan. Stat. Ann. §21–2512 (2007); Ky. Rev. Stat. Ann. §422.285 (Lexis Supp. 2008); La. Code Crim. Proc. Ann., Art. 926.1 (West Supp. 2009); Me. Rev. Stat. Ann., Tit. 15, §2137 (Supp. 2008); Md. Crim. Proc. Code Ann. §8–201 (Lexis 2008); Mich. Comp. Laws Ann. §770.16 (West Supp. 2009); Minn. Stat. §590.01 (2008); Mo. Rev. Stat. §547.035 (2008 Cum. Supp.); Mont. Code Ann. §46–21–110 (2007); Neb. Rev. Stat. §29–4120 (2008); Nev. Rev. Stat. §176.0918 (2007); N. H. Rev. Stat. Ann. §651–D:2 (2007); N. J. Stat. Ann. §2A:84A–32a (West Supp. 2009); N. M. Stat. Ann. §31–1a–2 (Supp. 2008); N. Y. Crim. Proc. Law Ann. §440.30(1–a) (West 2005); N. C. Gen. Stat. Ann. §15A–269 (Lexis 2007); N. D. Cent. Code Ann. §29–32.1–15 (Lexis 2006); Ohio Rev. Code Ann. §2953.72 (Lexis Supp. 2009); Ore. Rev. Stat. §138.690 (2007); 42 Pa.

A

As the Court notes, DNA testing often produces highly reliable results. See *ante*, at 8. Indeed, short tandem repeat (STR) "DNA tests can, in certain circumstances, establish to a virtual certainty whether a given individual did or did not commit a particular crime." *Harvey* v. *Horan*, 285 F. 3d 298, 305 (CA4 2002) (Luttig, J., respecting denial of rehearing en banc). Because of that potential for "virtual certainty," JUSTICE STEVENS argues that the State should welcome respondent's offer to perform modern DNA testing (at his own expense) on the State's DNA evidence; the test will either confirm respondent's guilt (in which case the State has lost nothing) or exonerate him (in which case the State has no valid interest in detaining

—————

Cons. Stat. §9543.1 (2006); R. I. Gen. Laws §10–9.1–11 (Supp. 2008); S. C. Code Ann. §17–28–30 (Supp. 2008); Tenn. Code Ann. §40–30–304 (2006); Tex. Code Crim. Proc. Ann., Arts. 64.01–64.05 (Vernon 2006 and Supp. 2008); Utah Code Ann. §78B–9–300 to 78B–9–304 (Lexis 2008 Supp.); Vt. Stat. Ann., Tit. 13, §5561 (Supp. 2008); Va. Code Ann. §19.2–327.1 (Lexis 2008); Wash. Rev. Code §10.73.170 (2008); W. Va. Code Ann. §15–2B–14 (Lexis Supp. 2008); Wis. Stat. §974.07 (2005–2006); Wyo. Stat. Ann. §7–12–303 (2008 Supp.). The pace of the legislative response has been so fast that two States have enacted statutes while this case was *sub judice:* The Governor of South Dakota signed a DNA access law on March 11, 2009, see H. R. 1166, and the Governor of Mississippi signed a DNA access law on March 16, 2009, see S. 2709. The only States that do not have DNA-testing statutes are Alabama, Alaska, Massachusetts, and Oklahoma; and at least three of those States have addressed the issue through judicial decisions. See *Fagan* v. *State*, 957 So. 2d 1159 (Ala. Crim. App. 2007); *Osborne* v. *State*, 110 P. 3d 986, 995 (Alaska App. 2005) *(Osborne I); Commonwealth* v. *Donald*, 66 Mass. App. 1110, 848 N. E. 2d 447 (2006). Because the Court relies on such evidence, JUSTICE STEVENS accuses it of "resembl[ing]" Justice Harlan's position in *Miranda* v. *Arizona,* 384 U. S. 436 (1966). See *post*, at 15, n. 10 (quoting 384 U. S., at 523–524 (dissenting opinion)). I can think of worse things than sharing Justice Harlan's judgment that "this Court's too rapid departure from existing constitutional standards" may "frustrat[e]" the States' "long-range and lasting" legislative efforts. *Id.,* at 524.

him).  See *post*, at 10–12.

Alas, it is far from that simple.  First, DNA testing— even when performed with modern STR technology, and even when performed in perfect accordance with protocols—often fails to provide "absolute proof" of anything. *Post*, at 12 (STEVENS, J., dissenting).  As one scholar has observed:

> "[F]orensic DNA testing rarely occurs [under] idyllic conditions.  Crime scene DNA samples do not come from a single source obtained in immaculate conditions; they are messy assortments of multiple unknown persons, often collected in the most difficult conditions.  The samples can be of poor quality due to exposure to heat, light, moisture, or other degrading elements.  They can be of minimal or insufficient quantity, especially as investigators push DNA testing to its limits and seek profiles from a few cells retrieved from cigarette butts, envelopes, or soda cans.  And most importantly, forensic samples often constitute a mixture of multiple persons, such that it is not clear whose profile is whose, or even how many profiles are in the sample at all.  All of these factors make DNA testing in the forensic context far more subjective than simply reporting test results . . . ."  Murphy, The Art in the Science of DNA: A Layperson's Guide to the Subjectivity Inherent in Forensic DNA Typing, 58 Emory L. J. 489, 497 (2008) (footnotes omitted).

See also R. Michaelis, R. Flanders, & P. Wulff, A Litigator's Guide to DNA 341 (2008) (hereinafter Michaelis) (noting that even "STR analyses are plagued by issues of suboptimal samples, equipment malfunctions and human error, just as any other type of forensic DNA test"); *Harvey* v. *Horan*, 278 F. 3d 370, 383, n. 4 (CA4 2002) (King, J., concurring in part and concurring in judgment) (noting that the first STR DNA test performed under Virginia's

postconviction DNA access statute was inconclusive). Such concerns apply with particular force where, as here, the sample is minuscule, it may contain three or more persons' DNA, and it may have degraded significantly during the 24 or more hours it took police to recover it.

Second, the State has important interests in maintaining the integrity of its evidence, and the risks associated with evidence contamination increase every time someone attempts to extract new DNA from a sample. According to Professor John Butler—who is said to have written "the canonical text on forensic DNA typing," Murphy, *supra*, at 493, n. 16—"[t]he extraction process is probably where the DNA sample is more susceptible to contamination in the laboratory than at any other time in the forensic DNA analysis process," J. Butler, Forensic DNA Typing 42 (2d ed. 2005).

Indeed, modern DNA testing technology is so powerful that it actually increases the risks associated with mishandling evidence. STR tests, for example, are so sensitive that they can detect DNA transferred from person X to a towel (with which he wipes his face), from the towel to Y (who subsequently wipes his face), and from Y's face to a murder weapon later wielded by Z (who can use STR technology to blame X for the murder). See Michaelis 62–64; Thompson, Ford, Doom, Raymer, & Krane, Evaluating Forensic DNA Evidence: Essential Elements of a Competent Defense Review (Part 2), The Champion, May 2003, pp. 25–26. Any test that is sensitive enough to pick up such trace amounts of DNA will be able to detect even the slightest, unintentional mishandling of evidence. See Michaelis 63 (cautioning against mishandling evidence because "two research groups have already demonstrated the ability to obtain STR profiles from fingerprints on paper or evidence objects"). And that is to say nothing of the intentional DNA-evidence-tampering scandals that have surfaced in recent years. See, *e.g.*, Murphy, The New

Forensics: Criminal Justice, False Certainty, and the Second Generation of Scientific Evidence, 95 Calif. L. Rev. 721, 772–773 (2007) (collecting examples). It gives short shrift to such risks to suggest that anyone—including respondent, who has twice confessed to his crime, has never recanted, and passed up the opportunity for DNA testing at trial—should be given a never-before-recognized constitutional right to rummage through the State's genetic-evidence locker.

Third, even if every test was guaranteed to provide a conclusive answer, and even if no one ever contaminated a DNA sample, that still would not justify disregarding the other costs associated with the DNA-access regime proposed by respondent. As the Court notes, recognizing a prisoner's freestanding right to access the State's DNA evidence would raise numerous policy questions, not the least of which is whether and to what extent the State is constitutionally obligated to collect and preserve such evidence. See *ante*, at 20. But the policy problems do not end there.

Even without our creation and imposition of a mandatory-DNA-access regime, state crime labs are already responsible for maintaining and controlling hundreds of thousands of new DNA samples every year. For example, in the year 2005, the State of North Carolina processed DNA samples in approximately 1,900 cases, while the State of Virginia processed twice as many. See Office of State Budget and Management, Cost Study of DNA Testing and Analysis As Directed by Session Law 2005–267, Section 15.8, pp. 5, 8 (Mar. 1, 2006) (hereinafter North Carolina Study), http://www.osbm.state.nc.us/files/pdf_files/3-1-2006FinalDNAReport.pdf (all Internet materials as visited June 16, 2009, and available in Clerk of Court's case file); see also *id.*, at 8 (noting that the State of Iowa processed DNA samples in 1,500 cases in that year). Each case often entails many separate DNA samples. See

Wisconsin Criminal Justice Study Commission, Position Paper: "Decreasing the Turnaround Time for DNA Testing," p. 2 (hereinafter Wisconsin Study), http://www.wcjsc. org/WCJSC_Report_on_DNA_Backlog.pdf ("An average case consists of 8 samples"). And these data—which are now four years out of date—dramatically underestimate the States' current DNA-related caseloads, which expand at an average annual rate of around 24%. See Wisconsin Dept. of Justice, Review of State Crime Lab Resources for DNA Analysis 6 (Feb. 12, 2007), http://www.doj.state. wi.us/news/files/dnaanalysisplan.pdf.

The resources required to process and analyze these hundreds of thousands of samples have created severe backlogs in state crime labs across the country. For example, the State of Wisconsin reports that it receives roughly 17,600 DNA samples per year, but its labs can process only 9,600. Wisconsin Study 2. Similarly, the State of North Carolina reports that "[i]t is not unusual for the [State] Crime Lab to have several thousand samples waiting to be outsourced due to the federal procedures for [the State's] grant. This is not unique to North Carolina but a national issue." North Carolina Study 9.

The procedures that the state labs use to handle these hundreds of thousands of DNA samples provide fertile ground for litigation. For example, in *Commonwealth* v. *Duarte*, 56 Mass. App. 714, 723, 780 N. E. 2d 99, 106 (2002), the defendant argued that "the use of a thermometer that may have been overdue for a standardization check rendered the DNA analysis unreliable and inadmissible" in his trial for raping a 13-year-old girl. The court rejected that argument and held "that the status of the thermometer went to the weight of the evidence, and not to its admissibility," *id.*, at 724, 780 N. E. 2d, at 106, and the court ultimately upheld Duarte's conviction after reviewing the testimony of the deputy director of the laboratory that the Commonwealth used for the DNA

tests, see *ibid.* But the case nevertheless illustrates "that no detail of laboratory operation, no matter how minute, is exempt as a potential point on which a defense attorney will question the DNA evidence." Michaelis 68; see also *id.*, at 68–69 (discussing the policy implications of *Duarte*).

My point in recounting the burdens that postconviction DNA testing imposes on the Federal Government and the States is not to denigrate the importance of such testing. Instead, my point is that requests for postconviction DNA testing are not cost free. The Federal Government and the States have a substantial interest in the implementation of rules that regulate such testing in a way that harnesses the unique power of DNA testing while also respecting the important governmental interests noted above. The Federal Government and the States have moved expeditiously to enact rules that attempt to perform this role. And as the Court holds, it would be most unwise for this Court, wielding the blunt instrument of due process, to interfere prematurely with these efforts.

### B

I see no reason for such intervention in the present case. When a criminal defendant, for tactical purposes, passes up the opportunity for DNA testing at trial, that defendant, in my judgment, has no constitutional right to demand to perform DNA testing after conviction. Recognition of such a right would allow defendants to play games with the criminal justice system. A guilty defendant could forgo DNA testing at trial for fear that the results would confirm his guilt, and in the hope that the other evidence would be insufficient to persuade the jury to find him guilty. Then, after conviction, with nothing to lose, the defendant could demand DNA testing in the hope that some happy accident—for example, degradation or contamination of the evidence—would provide the basis for seeking postconviction relief. Denying the opportunity for

such an attempt to game the criminal justice system
should not shock the conscience of the Court.

There is ample evidence in this case that respondent
attempted to game the system. At trial, respondent's
lawyer made an explicit, tactical decision to forgo restric-
tion-fragment-length-polymorphism (RFLP) testing in
favor of less-reliable DQ Alpha testing. Having forgone
more accurate DNA testing once before, respondent's
reasons for seeking it now are suspect. It is true that the
STR testing respondent now seeks is even more advanced
than the RFLP testing he declined—but his counsel did
not decline RFLP testing because she thought it was not
good enough; she declined because she thought it was too
good. *Osborne I*, 110 P. 3d 986, 990 (Alaska App. 2005).
"[A] defendant should not be allowed to take a gambler's
risk and complain only if the cards [fall] the wrong way."
*Osborne* v. *State*, 163 P. 3d 973, 984 (Alaska App. 2007)
*(Osborne II)* (Mannheimer, J., concurring) (internal quota-
tion marks omitted).

JUSTICE STEVENS contends that respondent should not
be bound by his attorney's tactical decision and notes that
respondent testified in the state postconviction proceeding
that he strongly objected to his attorney's strategy. See
*post*, at 11–12, n. 8. His attorney, however, had no mem-
ory of that objection, and the state court did not find that
respondent's testimony was truthful.[3] Nor do we have
reason to assume that respondent was telling the truth,
particularly since he now claims that he lied at his parole
hearing when he twice confessed to the crimes for which

_____

[3] The state court noted that respondent's trial counsel "'disbelieved
Osborne's statement that he did not commit the crime'" and therefore
"'elected to avoid the possibility of obtaining DNA test results that
might have confirmed Osborne's culpability.'" *Osborne I*, 110 P. 3d, at
990. Given the reasonableness of trial counsel's judgment, the state
court held that respondent's protestations (whether or not he made
them) were irrelevant. *Id.*, at 991–992.

he was convicted.

In any event, even assuming for the sake of argument that respondent did object at trial to his attorney's strategy, it is a well-accepted principle that, except in a few carefully defined circumstances, a criminal defendant is bound by his attorney's tactical decisions unless the attorney provided constitutionally ineffective assistance. See *Vermont* v. *Brillon*, 556 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 8).[4] Here, the state postconviction court rejected respondent's ineffective-assistance claim, *Osborne I, supra*, at 991–992; respondent does not challenge that holding; and we must therefore proceed on the assumption that his attorney's decision was reasonable and binding.[5]

\*  \*  \*

If a state prisoner wants to challenge the State's refusal to permit postconviction DNA testing, the prisoner should proceed under the habeas statute, which duly accounts for

---

[4] In adopting rules regarding postconviction DNA testing, the Federal and State Governments may choose to alter the traditional authority of defense counsel with respect to DNA testing. For example, the federal statute provides that a prisoner's declination of DNA testing at trial bars a request for postconviction testing only if the prisoner knowingly and voluntarily waived that right in a proceeding occurring after the enactment of the federal statute. 18 U. S. C. §3600(a)(3)(A)(i). But Alaska has specifically decided to retain the general rule regarding the authority of defense counsel. See *Osborne I, supra*, at 991–992 (citing *Simeon* v. *State*, 90 P. 3d 181, 184 (Alaska App. 2004)).

[5] JUSTICE STEVENS is quite wrong to suggest that the application of this familiar principle in the present context somehow lessens the prosecution's burden to prove a defendant's guilt. *Post*, at 12, n. 8 (citing *Sandstrom* v. *Montana*, 442 U. S. 510 (1979); *In re Winship*, 397 U. S. 358 (1970)). Respondent is not challenging the sufficiency of the State's evidence at trial. Rather, he claims that he has a right to obtain evidence that may be useful to him in a variety of postconviction proceedings. The principle that the prosecution must prove its case beyond a reasonable doubt and the principle that a defendant has no obligation to prove his innocence are not implicated in any way by the issues in this case.

the interests of federalism, comity, and finality. And in considering the merits of such a claim, the State's weighty interests cannot be summarily dismissed as "'arbitrary, or conscience shocking.'" *Post*, at 10 (STEVENS, J., dissenting). With these observations, I join the opinion of the Court.

# SUPREME COURT OF THE UNITED STATES

_____

### No. 08–6

_____

## DISTRICT ATTORNEY'S OFFICE FOR THE THIRD JUDICIAL DISTRICT, ET AL., PETITIONERS *v.* WILLIAM G. OSBORNE

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

#### [June 18, 2009]

JUSTICE STEVENS, with whom JUSTICE GINSBURG and JUSTICE BREYER join, and with whom JUSTICE SOUTER joins as to Part I, dissenting.

The State of Alaska possesses physical evidence that, if tested, will conclusively establish whether respondent William Osborne committed rape and attempted murder. If he did, justice has been served by his conviction and sentence. If not, Osborne has needlessly spent decades behind bars while the true culprit has not been brought to justice. The DNA test Osborne seeks is a simple one, its cost modest, and its results uniquely precise. Yet for reasons the State has been unable or unwilling to articulate, it refuses to allow Osborne to test the evidence at his own expense and to thereby ascertain the truth once and for all.

On two equally problematic grounds, the Court today blesses the State's arbitrary denial of the evidence Osborne seeks. First, while acknowledging that Osborne may have a due process right to access the evidence under Alaska's postconviction procedures, the Court concludes that Osborne has not yet availed himself of all possible avenues for relief in state court.[1] As both a legal and

_____

[1] Because the Court assumes *arguendo* that Osborne's claim was

factual matter, that conclusion is highly suspect. More troubling still, based on a fundamental mischaracterization of the right to liberty that Osborne seeks to vindicate, the Court refuses to acknowledge "in the circumstances of this case" any right to access the evidence that is grounded in the Due Process Clause itself. Because I am convinced that Osborne has a constitutional right of access to the evidence he wishes to test and that, on the facts of this case, he has made a sufficient showing of entitlement to that evidence, I would affirm the decision of the Court of Appeals.

I

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." §1. Our cases have frequently recognized that protected liberty interests may arise "from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by state laws or policies." *Wilkinson* v. *Austin*, 545 U. S. 209, 221 (2005). Osborne contends that he possesses a right to access DNA evidence arising from both these sources.

Osborne first anchors his due process right in Alaska Stat. §12.72.010(4) (2008). Under that provision, a person who has been "convicted of, or sentenced for, a crime may institute a proceeding for post-conviction relief if the person claims . . . that there exists evidence of material

properly brought under 42 U. S. C. §1983, rather than by an application for the writ of habeas corpus, I shall state only that I agree with the Ninth Circuit's endorsement of Judge Luttig's analysis of that issue. See 423 F. 3d 1050, 1053–1055 (2005) (citing *Harvey* v. *Horan*, 285 F. 3d 298, 308–309 (CA4 2002) (opinion respecting denial of rehearing en banc)); see also *McKithen* v. *Brown*, 481 F. 3d 89, 98 (CA2 2007) (agreeing that a claim seeking postconviction access to evidence for DNA testing may be properly brought as a §1983 suit); *Savory* v. *Lyons*, 469 F. 3d 667, 669 (CA7 2006) (same); *Bradley* v. *Pryor*, 305 F. 3d 1287, 1290–1291 (CA11 2002) (same).

facts, not previously presented and heard by the court, that requires vacation of the conviction or sentence in the interest of justice." *Ibid.*[2]  Osborne asserts that exculpatory DNA test results obtained using state-of-the-art Short Tandem Repeat (STR) and Mitochondrial (mtDNA) analysis would qualify as newly discovered evidence entitling him to relief under the state statute.  The problem is that the newly discovered evidence he wishes to present cannot be generated unless he is first able to access the State's evidence—something he cannot do without the State's consent or a court order.

Although States are under no obligation to provide mechanisms for postconviction relief, when they choose to do so, the procedures they employ must comport with the demands of the Due Process Clause, see *Evitts* v. *Lucey*, 469 U. S. 387, 393 (1985), by providing litigants with fair opportunity to assert their state-created rights.  Osborne contends that by denying him an opportunity to access the physical evidence, the State has denied him meaningful access to state postconviction relief, thereby violating his right to due process.

Although the majority readily agrees that Osborne has a protected liberty interest in demonstrating his innocence with new evidence under Alaska Stat. §12.72.010(4), see *ante*, at 14, it rejects the Ninth Circuit's conclusion that Osborne is constitutionally entitled to access the State's evidence.  The Court concludes that the adequacy of the

_____

[2] Ordinarily, claims under §12.72.010(4) must be brought within one year after the conviction becomes final.  §12.72.020(a)(3)(A).  However, the court may hear an otherwise untimely claim based on newly discovered evidence "if the applicant establishes due diligence in presenting the claim and sets out facts supported by evidence that is admissible and (A) was not known within . . . two years after entry of the judgment of conviction if the claim relates to a conviction; . . . (B) is not cumulative to the evidence presented at trial; (C) is not impeachment evidence; and (D) establishes by clear and convincing evidence that the applicant is innocent." §12.72.020(b)(2) (2002).

process afforded to Osborne must be assessed under the standard set forth in *Medina* v. *California*, 505 U. S. 437 (1992). Under that standard, Alaska's procedures for bringing a claim under §12.72.010(4) will not be found to violate due process unless they "'offen[d] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgres[s] any recognized principle of fundamental fairness in opera- tion.'" *Ante*, at 16 (quoting *Medina*, 505 U. S., at 446, 448).[3] After conducting a cursory review of the relevant statutory text, the Court concludes that Alaska's proce- dures are constitutional on their face.

While I agree that the statute is not facially deficient, the state courts' application of §12.72.010(4) raises serious questions whether the State's procedures are fundamen- tally unfair in their operation. As an initial matter, it is not clear that Alaskan courts ordinarily permit litigants to utilize the state postconviction statute to obtain new evidence in the form of DNA tests. The majority assumes that such discovery is possible based on a single, unpub- lished, nonprecedential decision from the Alaska Court of Appeals, see *ante*, at 16 (citing *Patterson* v. *State*, No. A– 8814 (Mar. 8, 2006)), but the State concedes that no liti- gant yet has obtained evidence for such testing under the statute.[4]

Of even greater concern is the manner in which the state courts applied §12.72.010(4) to the facts of this case.

_____

[3] Osborne contends that the Court should assess the validity of the State's procedures under the test set forth in *Mathews* v. *Eldridge*, 424 U. S. 319 (1976), rather than the more exacting test adopted by *Medina* v. *California*, 505 U. S. 437 (1992). In my view, we need not decide which standard governs because the state court's denial of access to the evidence Osborne seeks violates due process under either standard. See *Harvey*, 285 F. 3d, at 315 (Luttig, J).

[4] The State explained at oral argument that such testing was ordered in the *Patterson* case, but by the time access was granted, the relevant evidence had been destroyed. See Tr. of Oral Arg. 12.

In determining that Osborne was not entitled to relief under the postconviction statute, the Alaska Court of Appeals concluded that the DNA testing Osborne wished to obtain could not qualify as "newly discovered" because it was available at the time of trial. See *Osborne* v. *State*, 110 P. 3d 986, 992 (2005) *(Osborne I)*. In his arguments before the state trial court and his briefs to the Alaska Court of Appeals, however, Osborne had plainly requested STR DNA testing, a form of DNA testing not yet in use at the time of his trial. See App. 171, 175; see also 521 F. 3d 1118, 1123, n. 2 (CA9 2008). The state appellate court's conclusion that the requested testing had been available at the time of trial was therefore clearly erroneous.[5] Given these facts, the majority's assertion that Osborne "attempt[ed] to sidestep state process" by failing "to use the process provided to him by the State" is unwarranted. *Ante*, at 17.

The same holds true with respect to the majority's suggestion that the Alaska Constitution might provide additional protections to Osborne above and beyond those afforded under afforded under §12.72.010(4). In Osborne's state postconviction proceedings, the Alaska Court of Appeals held out the possibility that even when evidence does not meet the requirements of §12.72.010(4), the State Constitution might offer relief to a defendant who is able to make certain threshold showings. See *Osborne I*, 110 P. 3d, at 995–996. On remand from that decision, however, the state trial court denied Osborne relief on the ground that he failed to show that (1) his conviction rested primarily on eyewitness identification; (2) there was a demonstrable doubt concerning his identity as the perpe-

---

[5] The majority avoids confronting this serious flaw in the state court's decision by treating its mistaken characterization of the nature of Osborne's request as if it were binding. See *ante*, at 17. But see *ante*, at 5, n. 2 (conceding "[i]t is not clear" whether the state court erred in reaching that conclusion).

trator; and (3) scientific testing would like be conclusive on this issue. *Osborne* v. *State*, 163 P. 3d 973, 979–981 (Alaska App. 2007) *(Osborne II)*. The first two reasons reduce to an evaluation of the strength of the prosecution's original case—a consideration that carries little weight when balanced against evidence as powerfully dispositive as an exculpatory DNA test. The final reason offered by the state court—that further testing would not be conclusive on the issue of Osborne's guilt or innocence—is surely a relevant factor in deciding whether to release evidence for DNA testing. Nevertheless, the state court's conclusion that such testing would not be conclusive in this case is indefensible, as evidenced by the State's recent concession on that point. See also 521 F. 3d 1118, 1136–1139 (CA9 2008) (detailing why the facts of this case do not permit an inference that any exonerating test result would be less than conclusive).

Osborne made full use of available state procedures in his efforts to secure access to evidence for DNA testing so that he might avail himself of the postconviction relief afforded by the State of Alaska. He was rebuffed at every turn. The manner in which the Alaska courts applied state law in this case leaves me in grave doubt about the adequacy of the procedural protections afforded to litigants under Alaska Stat. §12.72.010(4), and provides strong reason to doubt the majority's flippant assertion that if Osborne were "simply [to] see[k] the DNA through the State's discovery procedures, he might well get it." *Ante*, at 17. However, even if the Court were correct in its assumption that Osborne might be given the evidence he seeks were he to present his claim in state court a second time, there should be no need for him to do so.

## II

Wholly apart from his state-created interest in obtaining postconviction relief under Alaska Stat. §12.72.010(4),

Osborne asserts a right to access the State's evidence that derives from the Due Process Clause itself. Whether framed as a "substantive liberty interest . . . protected through a procedural due process right" to have evidence made available for testing, or as a substantive due process right to be free of arbitrary government action, see *Harvey* v. *Horan*, 285 F. 3d 298, 315, 319 (CA4 2002) (Luttig, J., respecting denial of rehearing en banc),[6] the result is the same: On the record now before us, Osborne has established his entitlement to test the State's evidence.

The liberty protected by the Due Process Clause is not a creation of the Bill of Rights. Indeed, our Nation has long recognized that the liberty safeguarded by the Constitution has far deeper roots. See Declaration of Independence ¶2 (holding it self-evident that "all men are. . . endowed by their Creator with certain unalienable Rights," among which are "Life, Liberty, and the pursuit of Happiness"); see also *Meachum* v. *Fano*, 427 U. S. 215, 230 (1976) (STEVENS, J., dissenting). The "most elemental" of the liberties protected by the Due Process Clause is "the interest in being free from physical detention by one's own government." *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 529 (2004) (plurality opinion); see *Foucha* v. *Louisiana*, 504 U. S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause").

Although a valid criminal conviction justifies punitive detention, it does not entirely eliminate the liberty interests of convicted persons. For while a prisoner's "rights may be diminished by the needs and exigencies of the institutional environment[,] . . . [t]here is no iron curtain

---

[6] See *Harvey*, 285 F. 3d, at 318 (Luttig, J.) ("[T]he claimed right of access to evidence partakes of both procedural and substantive due process. And with a claim such as this, the line of demarcation is faint").

drawn between the Constitution and the prisons of this country." *Wolff* v. *McDonnell*, 418 U. S. 539, 555–556 (1974); *Shaw* v. *Murphy*, 532 U. S. 223, 228–229 (2001) ("[I]ncarceration does not divest prisoners of all constitutional protections"). Our cases have recognized protected interests in a variety of postconviction contexts, extending substantive constitutional protections to state prisoners on the premise that the Due Process Clause of the Fourteenth Amendment requires States to respect certain fundamental liberties in the postconviction context. See, *e.g.*, *Thornburgh* v. *Abbott*, 490 U. S. 401, 407 (1989) (right to free speech); *Turner* v. *Safley*, 482 U. S. 78, 84 (1987) (right to marry); *Cruz* v. *Beto*, 405 U. S. 319, 322 (1972) *(per curiam)* (right to free exercise of religion); *Lee* v. *Washington*, 390 U. S. 333 (1968) *(per curiam)* (right to be free of racial discrimination); *Johnson* v. *Avery*, 393 U. S. 483 (1969) (right to petition government for redress of grievances). It is therefore far too late in the day to question the basic proposition that convicted persons such as Osborne retain a constitutionally protected measure of interest in liberty, including the fundamental liberty of freedom from physical restraint.

Recognition of this right draws strength from the fact that 46 States and the Federal Government have passed statutes providing access to evidence for DNA testing, and 3 additional states (including Alaska) provide similar access through court-made rules alone, see Brief for State of California et al. as *Amici Curiae* 3–4, n. 1, and 2; *ante*, at 9. These legislative developments are consistent with recent trends in legal ethics recognizing that prosecutors are obliged to disclose all forms of exculpatory evidence that come into their possession following conviction. See, *e.g.*, ABA Model Rules of Professional Conduct 3.8(g)–(h) (2008); see also *Imbler* v. *Pachtman*, 424 U. S. 409, 427, n. 25 (1976) ("[A]fter a conviction the prosecutor also is bound by the ethics of his office to inform the appropriate

authority of after-acquired or other information that casts doubt upon the correctness of the conviction"). The fact that nearly all the States have now recognized some post-conviction right to DNA evidence makes it more, not less, appropriate to recognize a limited federal right to such evidence in cases where litigants are unfairly barred from obtaining relief in state court.

Insofar as it is process Osborne seeks, he is surely entitled to less than "the full panoply of rights," that would be due a criminal defendant prior to conviction, see *Morrissey* v. *Brewer*, 408 U. S. 471, 480 (1972). That does not mean, however, that our pretrial due process cases have no relevance in the postconviction context. In *Brady* v. *Maryland*, 373 U. S. 83, 87 (1963), we held that the State violates due process when it suppresses "evidence favorable to an accused" that is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Although *Brady* does not directly provide for a postconviction right to such evidence, the concerns with fundamental fairness that motivated our decision in that case are equally present when convicted persons such as Osborne seek access to dispositive DNA evidence following conviction.

Recent scientific advances in DNA analysis have made "it literally possible to confirm guilt or innocence beyond any question whatsoever, at least in some categories of cases." *Harvey*, 285 F. 3d, at 305 (Luttig, J.). As the Court recognizes today, the powerful new evidence that modern DNA testing can provide is "unlike anything known before." *Ante*, at 8. Discussing these important forensic developments in his oft-cited opinion in *Harvey*, Judge Luttig explained that although "no one would contend that fairness, in the constitutional sense, requires a post-conviction right of access or a right to disclosure anything approaching in scope that which is required pretrial," in cases "where the government holds previously-

produced forensic evidence, the testing of which conced-edly could prove beyond any doubt that the defendant did not commit the crime for which he was convicted, the very same principle of elemental fairness that dictates pre-trial production of all potentially exculpatory evidence dictates post-trial production of this infinitely narrower category of evidence." 285 F. 3d, at 317. It does so "out of recognition of the same systemic interests in fairness and ultimate truth." *Ibid.*

Observing that the DNA evidence in this case would be so probative of Osborne's guilt or innocence that it exceeds the materiality standard that governs the disclosure of evidence under *Brady*, the Ninth Circuit granted Os-borne's request for access to the State's evidence. See 521 F. 3d, at 1134. In doing so, the Court of Appeals recog-nized that Osborne possesses a narrow right of postconvic-tion access to biological evidence for DNA testing "where [such] evidence was used to secure his conviction, the DNA testing is to be conducted using methods that were un-available at the time of trial and are far more precise than the methods that were then available, such methods are capable of conclusively determining whether Osborne is the source of the genetic material, the testing can be con-ducted without cost or prejudice to the State, and the evidence is material to available forms of post-conviction relief." *Id.*, at 1142. That conclusion does not merit reversal.

If the right Osborne seeks to vindicate is framed as purely substantive, the proper result is no less clear. "The touchstone of due process is protection of the individual against arbitrary action of government," *Meachum*, 427 U. S., at 226 (internal quotation marks omitted); *Wolff*, 418 U. S., at 558; *County of Sacramento* v. *Lewis*, 523 U. S. 833, 845–846 (1998). When government action is so lacking in justification that it "can properly be character-ized as arbitrary, or conscience shocking, in a constitu-

tional sense," *Collins* v. *Harker Heights*, 503 U. S. 115, 128 (1992), it violates the Due Process Clause. In my view, the State's refusal to provide Osborne with access to evidence for DNA testing qualifies as arbitrary.

Throughout the course of state and federal litigation, the State has failed to provide any concrete reason for denying Osborne the DNA testing he seeks, and none is apparent. Because Osborne has offered to pay for the tests, cost is not a factor. And as the State now concedes, there is no reason to doubt that such testing would provide conclusive confirmation of Osborne's guilt or revelation of his innocence.[7] In the courts below, the State refused to provide an explanation for its refusal to permit testing of the evidence, see Brief for Respondent 33, and in this Court, its explanation has been, at best, unclear. Insofar as the State has articulated any reason at all, it appears to be a generalized interest in protecting the finality of the judgment of conviction from any possible future attacks. See Brief for Petitioners 18, 50.[8]

––––––––––

[7] JUSTICE ALITO provides a detailed discussion of dangers such as laboratory contamination and evidence tampering that may reduce the reliability not only of DNA evidence, but of any type of physical forensic evidence. *Ante*, at 3–10 (concurring opinion). While no form of testing is error proof in every case, the degree to which DNA evidence has become a foundational tool of law enforcement and prosecution is indicative of the general reliability and probative power of such testing. The fact that errors may occur in the testing process is not a ground for refusing such testing altogether—were it so, such evidence should be banned at trial no less than in postconviction proceedings. More important still is the fact that the State now concedes there is no reason to doubt that if STR and mtDNA testing yielded exculpatory results *in this case*, Osborne's innocence would be established.

[8] In his concurring opinion, JUSTICE ALITO suggests other reasons that might motivate States to resist access to such evidence, including concerns over DNA testing backlogs and manipulation by defendants. See *ante*, at 8–10. Not only were these reasons not offered by the State of Alaska as grounds for its decision in this case, but they are not in themselves compelling. While state resource constraints might justify

While we have long recognized that States have an interest in securing the finality of their judgments, see, *e.g.*, *Duncan* v. *Walker*, 533 U. S. 167, 179 (2001); *Teague* v. *Lane*, 489 U. S. 288, 309 (1989) (plurality opinion); *McCleskey* v. *Zant*, 499 U. S. 467, 491–492 (1991), finality is not a stand-alone value that trumps a State's overriding interest in ensuring that justice is done in its courts and secured to its citizens. Indeed, when absolute proof of innocence is readily at hand, a State should not shrink from the possibility that error may have occurred. Rather, our system of justice is strengthened by "recogniz[ing] the need for, and imperative of, a safety valve in those rare instances where objective proof that the convicted actually did not commit the offense later becomes available through the progress of science." *Harvey*, 285 F. 3d, at 306 (Luttig, J.). DNA evidence has led to an extraordinary series of exonerations, not only in cases where the trial evidence was weak, but also in cases where the convicted

_____

delays in the testing of postconviction DNA evidence, they would not justify an outright ban on access to such evidence. And JUSTICE ALITO's concern that guilty defendants will "play games with the criminal justice system" with regard to the timing of their requests for DNA evidence is not only speculative, but gravely concerning. *Ante*, at 10. It bears remembering that criminal defendants are under no obligation to prove their innocence at trial; rather, the State bears the burden of proving their guilt. See *Sandstrom* v. *Montana*, 442 U. S. 510 (1979); *In re Winship*, 397 U. S. 358 (1970). Having no obligation to conduct pretrial DNA testing, a defendant should not be bound by a decision to forgo such testing at trial, particularly when, as in this case, the choice was made by counsel over the defendant's strong objection. See *Osborne I*, 110 P. 3d, at 990-991. (JUSTICE ALITO suggests there is reason to doubt whether Osborne asked his counsel to perform DNA testing prior to trial, *ante*, at 12. That fact was not disputed in the state courts, however. Although Osborne's trial counsel averred that she "did not have a present memory of Osborne's desire to have [a more specific discriminatory] test of his DNA done," she also averred that she was "willing to accept that he does" and that she "would have disagreed with him." *Id.*, at 990.)

parties confessed their guilt and where the trial evidence against them appeared overwhelming.[9]   The examples provided by *amici* of the power of DNA testing serve to convince me that the fact of conviction is not sufficient to justify a State's refusal to perform a test that will conclusively establish innocence or guilt.

This conclusion draws strength from the powerful state interests that offset the State's purported interest in finality *per se*.   When a person is convicted for a crime he did not commit, the true culprit escapes punishment. DNA testing may lead to his identification.   See Brief for Current and Former Prosecutors as *Amici Curiae* 16 (noting that in more than one-third of all exonerations DNA testing identified the actual offender).   Crime victims, the law enforcement profession, and society at large share a strong interest in identifying and apprehending the actual perpetrators of vicious crimes, such as the rape and attempted murder that gave rise to this case.

The arbitrariness of the State's conduct is highlighted by comparison to the private interests it denies.   It seems to me obvious that if a wrongly convicted person were to produce proof of his actual innocence, no state interest would be sufficient to justify his continued punitive detention.   If such proof can be readily obtained without imposing a significant burden on the State, a refusal to provide access to such evidence is wholly unjustified.

In sum, an individual's interest in his physical liberty is one of constitutional significance.   That interest would be

_____

[9] See generally Brief for Current and Former Prosecutors as *Amici Curiae*; Brief for Jeanette Popp et al. as *Amici Curiae*; see also Brief for Individuals Exonerated by Postconviction DNA Testing as *Amici Curiae* 1–20.  See also Garrett, Judging Innocence, 108 Colum. L. Rev. 55, 109 (2008) (documenting that in 50% of cases in which DNA evidence exonerated a convicted person, reviewing courts had commented on the exoneree's likely guilt and in 10% of the cases had described the evidence supporting conviction as "overwhelming").

vindicated by providing postconviction access to DNA evidence, as would the State's interest in ensuring that it punishes the true perpetrator of a crime. In this case, the State has suggested no countervailing interest that justifies its refusal to allow Osborne to test the evidence in its possession and has not provided any other nonarbitrary explanation for its conduct. Consequently, I am left to conclude that the State's failure to provide Osborne access to the evidence constitutes arbitrary action that offends basic principles of due process. On that basis, I would affirm the judgment of the Ninth Circuit.

## III

The majority denies that Osborne possesses a cognizable substantive due process right "under the circumstances of this case," and offers two meager reasons for its decision. First, citing a general reluctance to "'expand the concept of substantive due process,'" *ante*, at 19 (quoting *Collins*, 503 U. S., at 125), the Court observes that there is no long history of postconviction access to DNA evidence. "'The mere novelty of such a claim,'" the Court asserts, "'is reason enough to doubt that "substantive due process" sustains it,'" *ante*, at 19 (quoting *Reno* v. *Flores*, 507 U. S. 292, 303 (1993)). The flaw is in the framing. Of course courts have not historically granted convicted persons access to physical evidence for STR and mtDNA testing. But, as discussed above, courts have recognized a residual substantive interest in both physical liberty and in freedom from arbitrary government action. It is Osborne's interest in those well-established liberties that justifies the Court of Appeals' decision to grant him access to the State's evidence for purposes of previously unavailable DNA testing.

The majority also asserts that this Court's recognition of a limited federal right of access to DNA evidence would be ill advised because it would "short circuit what looks to be

a prompt and considered legislative response" by the States and Federal Government to the issue of access to DNA evidence. Such a decision, the majority warns, would embroil the Court in myriad policy questions best left to other branches of government. *Ante*, at 19–20. The majority's arguments in this respect bear close resemblance to the manner in which the Court once approached the now-venerable right to counsel for indigent defendants. Before our decision in *Powell* v. *Alabama*, 287 U. S. 45 (1932), state law alone governed the manner in which counsel was appointed for indigent defendants. "Efforts to impose a minimum federal standard for the right to counsel in state courts routinely met the same refrain: 'in the face of these widely varying state procedures,' this Court refused to impose the dictates of 'due process' onto the states and 'hold invalid all procedure not reaching that standard." Brief for Current and Former Prosecutors as *Amici Curiae* 28, n. 8 (quoting *Bute* v. *Illinois*, 333 U. S. 640, 668 (1948)). When at last this Court recognized the Sixth Amendment right to counsel for all indigent criminal defendants in *Gideon* v. *Wainwright*, 372 U. S. 335 (1963), our decision did not impede the ability of States to tailor their appointment processes to local needs, nor did it unnecessarily interfere with their sovereignty. It did, however, ensure that criminal defendants were provided with the counsel to which they were constitutionally entitled.[10] In the same way, a decision to recognize a limited

---

[10] The majority's position also resembles that taken by Justice Harlan in his dissent in *Miranda* v. *Arizona*, 384 U. S. 436, 523 (1966), in which he faulted the Court for its "ironic untimeliness." He noted that the Court's decision came at time when scholars, politicians, and law enforcement officials were beginning to engage in a "massive reexamination of criminal law enforcement procedures on a scale never before witnessed," and predicted that the practical effect of the Court's decision would be to "handicap seriously" those sound efforts. *Id.,* at 523–524. Yet time has vindicated the decision in *Miranda*. The Court's

right of postconviction access to DNA testing would not prevent the States from creating procedures by which litigants request and obtain such access; it would merely ensure that States do so in a manner that is nonarbitrary.

While it is true that recent advances in DNA technology have led to a nationwide reexamination of state and federal postconviction procedures authorizing the use of DNA testing, it is highly unlikely that affirming the judgment of the Court of Appeals would significantly affect the use of DNA testing in any of the States that have already developed statutes and procedures for dealing with DNA evidence or would require the few States that have not yet done so to postpone the enactment of appropriate legislation.[11]   Indeed, a holding by this Court that the policy

————————

refusal to grant Osborne access to critical DNA evidence rests on a practical judgment remarkably similar to Justice Harlan's, and I find the majority's judgment today as profoundly incorrect as the *Miranda* minority's was yesterday.

[11] The United States and several States have voiced concern that the recognition of a limited federal right of access to DNA evidence might call into question reasonable limits placed on such access by federal and state statutes.  See Brief for United States as *Amicus Curiae* 17–26; Brief for State of California et al. as *Amici Curiae* 1–16.  For example, federal law and several state statutes impose the requirement that an applicant seeking postconviction DNA testing execute an affidavit attesting to his innocence before any request will be performed.  See, *e.g.*, 18 U. S. C. §3600(a)(1); Fla. Stat. §925.11(2)(a)(3) (2009 Supp.). Affirming the judgment of the Ninth Circuit would not cast doubt on the constitutionality of such a requirement, however, since Osborne was never asked to execute such an affidavit as a precondition to obtaining access to the State's evidence.  Similarly, affirmance would not call into question the legitimacy of other reasonable conditions States may place on access to DNA testing, such as Alaska's requirement that test results be capable of yielding a clear answer with respect to guilt or innocence.  "[D]ue process is flexible," *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972), and the manner in which it is provided may reasonably vary from State to State and case to case.  So long as the limitations placed on a litigant's access to such evidence remain procedurally fair and nonarbitrary, they will comport with the demands of

STEVENS, J., dissenting

judgments underlying that legislation rest on a sound constitutional foundation could only be constructive.

IV

Osborne has demonstrated a constitutionally protected right to due process which the State of Alaska thus far has not vindicated and which this Court is both empowered and obliged to safeguard. On the record before us, there is no reason to deny access to the evidence and there are many reasons to provide it, not least of which is a fundamental concern in ensuring that justice has been done in this case. I would affirm the judgment of the Court of Appeals, and respectfully dissent from the Court's refusal to do so.

————————

due process.

# SUPREME COURT OF THE UNITED STATES

No. 08–6

DISTRICT ATTORNEY'S OFFICE FOR THE THIRD JUDICIAL DISTRICT, ET AL., PETITIONERS *v.* WILLIAM G. OSBORNE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 18, 2009]

JUSTICE SOUTER, dissenting.

I respectfully dissent on the ground that Alaska has failed to provide the effective procedure required by the Fourteenth Amendment for vindicating the liberty interest in demonstrating innocence that the state law recognizes. I therefore join Part I of JUSTICE STEVENS's dissenting opinion.

I would not decide Osborne's broad claim that the Fourteenth Amendment's guarantee of due process requires our recognition at this time of a substantive right of access to biological evidence for DNA analysis and comparison. I would reserve judgment on the issue simply because there is no need to reach it; at a general level Alaska does not deny a right to postconviction testing to prove innocence, and in any event, Osborne's claim can be resolved by resort to the procedural due process requirement of an effective way to vindicate a liberty interest already recognized in state law, see *Evitts* v. *Lucey*, 469 U. S. 387, 393 (1985). My choice to decide this case on that procedural ground should not, therefore, be taken either as expressing skepticism that a new substantive right to test should be cognizable in some circumstances, or as implying agreement with the Court that it would necessarily be

premature for the Judicial Branch to decide whether such a general right should be recognized.

There is no denying that the Court is correct when it notes that a claim of right to DNA testing, post-trial at that, is a novel one, but that only reflects the relative novelty of testing DNA, and in any event is not a sufficient reason alone to reject the right asserted, see *Reno* v. *Flores*, 507 U. S. 292, 318–319 (1993) (O'Connor, J., concurring). Tradition is of course one serious consideration in judging whether a challenged rule or practice, or the failure to provide a new one, should be seen as violating the guarantee of substantive due process as being arbitrary, or as falling wholly outside the realm of reasonable governmental action. See *Poe* v. *Ullman*, 367 U. S. 497, 542 (1961) (Harlan, J., dissenting). We recognize the value and lessons of continuity with the past, but as Justice Harlan pointed out, society finds reasons to modify some of its traditional practices, *ibid.*, and the accumulation of new empirical knowledge can turn yesterday's reasonable range of the government's options into a due process anomaly over time.

As for determining the right moment for a court to decide whether substantive due process requires recognition of an individual right unsanctioned by tradition (or the invalidation of traditional law), I certainly agree with the Court that the beginning of wisdom is to go slow. Substantive due process expresses the conception that the liberty it protects is a freedom from arbitrary government action, from restraints lacking any reasonable justification *id.*, at 541,[1] and a substantive due process claim requires attention to two closely related elements that call for great care on the part of a court. It is crucial, first, to be clear about whose understanding it is that is being taken as the

---

[1] *Mutatis mutandis*, the same is true of our notions of life and property, subject to the same due process guarantee.

touchstone of what is arbitrary and outside the sphere of reasonable judgment.  And it is just as essential to recognize how much time society needs in order to work through a given issue before it makes sense to ask whether a law or practice on the subject is beyond the pale of reasonable choice, and subject to being struck down as violating due process.

It goes without saying that the conception of the reasonable looks to the prevailing understanding of the broad society, not to individual notions that a judge may entertain for himself alone, *id.*, at 542, 544, and in applying a national constitution the society of reference is the nation. On specific issues, widely shared understandings within the national society can change as interests claimed under the rubric of liberty evolve into recognition, see *Griswold* v. *Connecticut*, 381 U. S. 479 (1965) (personal privacy); *Lawrence* v. *Texas*, 539 U. S. 558 (2003) (sexual intimacy), see also *Washington* v. *Glucksberg*, 521 U. S. 702, 752 (1997) (SOUTER, J., concurring in judgment), or are recast in light of experience and accumulated knowledge, compare *Roe* v. *Wade*, 410 U. S. 113 (1973), with *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992) (joint opinion of O'Connor, KENNEDY and SOUTER, JJ.).

Changes in societal understanding of the fundamental reasonableness of government actions work out in much the same way that individuals reconsider issues of fundamental belief.  We can change our own inherited views just so fast, and a person is not labeled a stick-in-the-mud for refusing to endorse a new moral claim without having some time to work through it intellectually and emotionally.  Just as attachment to the familiar and the limits of experience affect the capacity of an individual to see the potential legitimacy of a moral position, the broader society needs the chance to take part in the dialectic of public and political back and forth about a new liberty claim

before it makes sense to declare unsympathetic state or national laws arbitrary to the point of being unconstitutional. The time required is a matter for judgment depending on the issue involved, but the need for some time to pass before a court entertains a substantive due process claim on the subject is not merely the requirement of judicial restraint as a general approach, but a doctrinal demand to be satisfied before an allegedly lagging legal regime can be held to lie beyond the discretion of reasonable political judgment.

Despite my agreement with the Court on this importance of timing, though, I do not think that the doctrinal requirement necessarily stands in the way of any substantive due process consideration of a postconviction right to DNA testing, even as a right that is freestanding. Given the pace at which DNA testing has come to be recognized as potentially dispositive in many cases with biological evidence, there is no obvious argument that considering DNA testing at a general level would subject wholly intransigent legal systems to substantive due process review prematurely. But, as I said, there is no such issue before us, for Alaska does not flatly deny access to evidence for DNA testing in postconviction cases.

In another case, a judgment about appropriate timing might also be necessary on issues of substantive due process at the more specific level of the State's conditions for exercising the right to test. Several such limitations are potentially implicated, including the need of a claimant to show that the test results would be material as potentially showing innocence, and the requirement that the testing sought be capable of producing new evidence not available at trial. But although I assume that avoiding prematurity is as much a doctrinal consideration in assessing the conditions affecting a substantive right as it is when the

substantive right itself is the subject of a general claim,[2] there is no need here to resolve any timing issue that might be raised by challenges to these details.

Osborne's objection here is not only to the content of the State's terms and conditions, but also to the adequacy of Alaska's official machinery in applying them, and there is no reason to defer consideration of this due process claim: given the conditions Alaska has placed on the right it recognizes, the due process guarantee requires the State to provide an effective procedure for proving entitlement to relief under that scheme, *Evitts*, 469 U. S., at 393, and the State has failed. On this issue, Osborne is entitled to relief. Alaska has presented no good reasons even on its own terms for denying Osborne the access to the evidence he seeks, and the inexplicable failure of the State to provide an effective procedure is enough to show a need for a §1983 remedy, and relief in this case. JUSTICE STEVENS deals with this failure in Part I of his dissent, which I join, and I emphasize only two points here.

In effect, Alaska argues against finding any right to relief in a federal §1983 action because the procedure the State provides is reasonable and adequate to vindicate the post-trial liberty interest in testing evidence that the State has chosen to recognize.[3] When I first considered the

_____

[2] It makes sense to approach these questions as governed by the same requirement to allow time for adequate societal and legislative consideration that substantive liberty interests should receive at a general level. As Judge Luttig has pointed out, there is no hermetic line between the substantive and the procedural in due process analysis, *Harvey* v. *Horan*, 285 F. 3d 298, 318–319 (CA4 2002), and in this case one could argue back and forth about the better characterization of various state conditions as being one or the other.

[3] Alaska does not argue that the State's process for vindicating the right to test, however inadequate, defines the limit of the right it recognizes, with a consequence that, by definition, the liberty interest recognized by the State calls for no process for its vindication beyond what the State provides.

State's position I thought Alaska's two strongest points were these: (1) that in Osborne's state litigation he failed to request access for the purpose of a variety of postconviction testing that could not have been done at time of trial (and thus sought no new evidence by his state-court petition); and (2) that he failed to aver actual innocence (and thus failed to place his oath behind the assertion that the evidence sought would be material to his postconviction claim). Denying him any relief under these circumstances, the argument ran, did not indicate any inadequacy in the state procedure that would justify resort to §1983 for providing due process.

Yet the record shows that Osborne has been denied access to the evidence even though he satisfied each of these conditions. As for the requirement to claim testing by a method not available at trial, Osborne's state-court appellate brief specifically mentioned his intent to conduct short tandem repeat (STR) analysis, App. at 171, 175, and the State points to no pleading, brief, or evidence that Osborne ever changed this request.

The State's reliance on Osborne's alleged failure to claim factual innocence is equally untenable. While there is no question that after conviction and imprisonment he admitted guilt under oath as a condition for becoming eligible for parole, the record before us makes it equally apparent that he claims innocence on oath now. His affidavit filed in support of his request for evidence under §1983 contained the statement, "I have always maintained my innocence," *id.*, at 226, ¶2, followed by an explanation that his admission of guilt was a necessary gimmick to obtain parole, *id.*, at 227, ¶7. Since the State persists in maintaining that Osborne is not entitled to test its evidence, it is apparently mere makeweight for the State to claim that he is not entitled to §1983 relief because he failed to claim innocence seriously and unequivocally.

This is not the first time the State has produced reasons

for opposing Osborne's request that collapse upon inspection. Arguing before the Ninth Circuit, the State maintained that the DNA evidence Osborne sought was not material; that is, it argued that a test excluding Osborne as the source of semen in the blue condom, found near the bloody snow and spent shell casing in the secluded area where the victim was raped by one man, would not "establish that he was factually innocent" or even "undermine confidence . . . in the verdict." Reply of Appellant, in No. 06-35875 (CA9 2008), p. 18; see also 521 F. 3d 1118, 1136 (CA9 2008). Such an argument is patently untenable, and the State now concedes that a favorable test could "conclusively establish Osborne's innocence." Reply to Brief in Opposition 8.

Standing alone, the inadequacy of each of the State's reasons for denying Osborne access to the DNA evidence he seeks would not make out a due process violation.[4] But taken as a whole the record convinces me that, while Alaska has created an entitlement of access to DNA evidence under conditions that are facially reasonable, the State has demonstrated a combination of inattentiveness and intransigence in applying those conditions that add up to procedural unfairness that violates the Due Process Clause.

---

[4] This Court is not in a position to correct individual errors of the Alaska Court of Appeals or Alaska officials, as §1983 does not serve as a mechanism to review specific, unfavorable state-law determinations.